**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

AMERICAN COLLEGE OF NURSE-
MIDWIVES,

Plaintiff,

v.

MISSISSIPPI STATE BOARD OF
MEDICAL LICENSURE, KENNETH
CLEVELAND, *in his official capacity as the
Executive Director of the Mississippi State
Board of Medical Licensure*; CHARLES
KENNETH LIPPINCOTT, MICHELLE Y.
OWENS, RODERICK GIVENS, KIRK L.
KINARD, ALLEN GERSH, WILLIAM
EUGENE LOPER, RANDY ROTH,
CARLOS LATORRE, *in their official
capacities as members of the Mississippi State
Board of Medical Licensure*; RENIA R.
DOTSON, *in her official capacity as a
member of the Mississippi State Board of
Medical Licensure and her official capacity
as a member of the Mississippi Board of
Nursing*; SANDRA CULPEPPER, JEREMY
L. CUMMINS, LACEY T. GENTRY, JANIE
CLANTON, T.J. ADAMS, ALVENO N.
CASTILLA, CARLY WALKER, JANEL
MOODY, BEVERLY E. OLIVER,
ANDREW CALHOUN, LAWANDA
BASKIN, DANIEL MATTHEW
SISTRUNK, *in their official capacities as
members of the Mississippi Board of Nursing*;
*and* PHYLLIS POLK JOHNSON, *in her
official capacity as Executive Director of the
Mississippi Board of Nursing*,

Defendants.

No. 3:26-cv-40-TSL-RPM

1

This complaint seeks to vindicate the rights of Mississippi's certified nurse-midwives to practice their profession free from irrational and anti-competitive constraint and thereby help Mississippi families obtain safe, affordable healthcare for mothers and infants.

## INTRODUCTION

1.      There is a public health emergency in Mississippi: from infant mortality, to maternal mortality, to preterm birth, to c-section rates, Mississippi ranks at the bottom of nearly every statistic related to the health of mothers and babies. A major cause of the crisis is lack of access to prenatal and maternal care. Many parts of Mississippi do not have even a single obstetric care provider.

2.      On August 21, 2025, the Mississippi State Department of Health declared a public health emergency in response to rising infant mortality rates across the state. In announcing the emergency, Mississippi's State Health Officer urged stakeholders to take steps to eliminate OB deserts, increase prenatal and post-partum care opportunities, and provide "more resources for moms and babies" to address gaps in maternal care.

3.      A major barrier to closing Mississippi's gaps in prenatal and postpartum care— and thereby reducing infant mortality—is a statutory restriction on the practices of certified nurse-midwives ("CNMs"). CNMs are educated, trained, and licensed to provide a broad range of women's healthcare. In particular, CNMs provide prenatal care, attend labor and delivery, and furnish follow-up postpartum services (collectively, "Maternity Care").

4.      CNMs in Mississippi, however, are prohibited by statute (Miss. Code § 73-15-20) from engaging in their profession unless they have the collaboration of a licensed Mississippi physician who has a compatible medical practice. While the statutory requirement applies to all advanced practice registered nurses ("APRNs"), this case challenges only the application of the

collaboration requirement to CNMs. This collaboration can be expensive, and sometimes impossible, for CNMs to obtain because few Mississippi physicians are willing to collaborate with CNMs who often compete to serve the same patients. Mississippi has the lowest per-capita number of OB/GYNs in the country, leaving few physicians in the state even capable of collaborating on the full scope of a CNM's practice. As a result, it is extremely difficult to practice as a CNM in Mississippi, even though CNMs are fully educated, trained, and capable of providing prenatal and maternal care without the assistance of a physician.

5.      The American College of Nurse-Midwives ("ACNM") brings this case on behalf of its Mississippi members who are subject to the burdensome and antiquated collaboration requirement. The requirement does nothing to advance patient safety or quality of care because CNMs are already educated, trained, qualified, and licensed by the Board of Nursing to provide labor and delivery services and prenatal and maternal care. The statute, and the Nursing Board Regulations implementing it, are so irrational as to violate the Fourteenth Amendment.

6.      Further, the Mississippi State Board of Medical Licensure ("MSBML") (whose voting membership is composed exclusively of physicians), has adopted regulations that go beyond the statutory requirements to add restrictions for physicians participating in collaborative relationships, ultimately resulting in even greater barriers to CNMs trying to practice in Mississippi. These regulations discourage physicians from collaborating, raise the price of collaboration, and give physicians even more incentive to exclude CNMs, who are their potential competitors, from practicing at all. These restrictions are purportedly premised on safety concerns, but there is no reliable, empirical evidence that CNMs provide care that is less safe than that provided by physicians. To the contrary, extensive empirical literature demonstrates

that midwife-led care for low-risk pregnancies produces outcomes comparable to—or better than—physician-led care, while improving access in underserved areas.

7.    It is no surprise that physician groups like the American Medical Association and its affiliates have consistently lobbied in favor of—and lobbied against repeal of—collaboration requirements like those challenged here. The MSBML's effort to enhance Mississippi's collaboration requirement by adopting these additional anticompetitive regulations violates the antitrust laws. Indeed, the United States Federal Trade Commission has noted that physicians who oppose efforts to repeal such collaboration requirements may be motivated by their own economic self-interest.

8.    Accordingly, as explained in the remainder of this complaint, this Court should enjoin the enforcement of these statutory and regulatory collaboration requirements as to CNMs.

## JURISDICTION AND VENUE

### A. Constitutional Claims

9.    Plaintiff seeks declaratory and injunctive relief pursuant to the Fourteenth Amendment to the United States Constitution, the Civil Rights Act of 1871 (42 U.S.C. § 1983), the Declaratory Judgment Act (28 U.S.C. § 2201), and Rule 57 of the Federal Rules of Civil Procedure.

10.    This Court has jurisdiction over Plaintiff's federal constitutional claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

11.    Venue is proper in this district for Plaintiff's federal constitutional claims pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this district and all Defendants are located in this district.

**B. Federal Antitrust Claims**

12.    Plaintiff seeks injunctive relief for antitrust claims pursuant to Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 16 of the Clayton Act (15 U.S.C. § 26).

13.    This Court has jurisdiction over Plaintiff's federal antitrust claims pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, as well as under 28 U.S.C. §§ 1331 and 1337(a).

14.    Venue is proper in this District for Plaintiff's federal antitrust claims pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391) because the Mississippi State Board of Medical Licensure defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District. No other forum would be more convenient for the parties and witnesses to litigate this case.

**C. State Antitrust Claims**

15.    Plaintiff seeks injunctive relief for antitrust claims pursuant to the Mississippi Antitrust Act, Miss. Code §§ 75-21-1, 75-21-3.

16.    This Court has supplemental jurisdiction over Plaintiff's claims under the Mississippi Antitrust Act pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiff's federal antitrust and constitutional claims that they form part of the same case or controversy. Plaintiff's state-law antitrust claims arise from the same nucleus of operative facts as the federal claims—namely, the challenged adoption, maintenance, and enforcement of the MSBML's Physician Collaboration Rules and related restraints.

## PARTIES

**A. The MSBML Members and Personnel**

17.     Defendant MSBML is responsible for licensing and regulating physicians in Mississippi, including the discipline of physicians who violate the statutory or regulatory requirements of their licenses.

18.     The MSBML maintains and enforces the regulations it has promulgated relating to physician collaboration with CNMs and other APRNs.

19.     Defendant Kenneth Cleveland, M.D., is the Executive Director of the MSBML. He is responsible for the day-to-day operations of the MSBML. The MSBML Board Members act through the MSBML Executive Director. He is sued in his official capacity.

20.     The MSBML is comprised of nine physician "Board Members" who are nominated by the Mississippi State Medical Association ("MSMA") and appointed by the governor. The governor must choose from the MSMA's nominees, so all voting MSBML Board Members are also MSMA members.

21.     Defendant Charles Kenneth "Ken" Lippincott, M.D., is a Board Member and the President of the MSBML. He is an actively practicing physician in Mississippi. He is sued in his official capacity.

22.     Defendant Michelle Y. Owens, M.D., is a Board Member and the Vice President of the MSBML. She is an actively practicing physician in Mississippi. She is sued in her official capacity.

23.     Defendant Roderick Givens, M.D., is a Board Member and the Secretary of the MSBML. He is an actively practicing physician in Mississippi. He is sued in his official capacity.

24.     Defendant Kirk L. Kinard, D.O., is a Board Member of the MSBML. He is an actively practicing physician in Mississippi. He is sued in his official capacity.

25.     Defendant Allen Gersh, M.D., is a Board Member of the MSBML. He is an actively practicing physician in Mississippi. He is sued in his official capacity.

26.     Defendant William Eugene Loper, III, M.D., is a Board Member of the MSBML. He is an actively practicing physician in Mississippi. He is sued in his official capacity.

27.     Defendant Renia R. Dotson, M.D., is a Board Member of the MSBML. She is an actively practicing physician in Mississippi. She is sued in her official capacity.

28.     Defendant Randy Roth, M.D., is a Board Member of the MSBML. He is an actively practicing physician in Mississippi. He is sued in his official capacity.

29.     Defendant Carlos Latorre, M.D., is a Board Member of the MSBML. He is an actively practicing physician in Mississippi. He is sued in his official capacity.

**B.  The Mississippi Board of Nursing Members and Personnel**

30.     The Mississippi Board of Nursing ("Nursing Board") is responsible for licensing and regulating the practice of nursing in the State of Mississippi, including the discipline of nurses who violate the statutory or regulatory requirements of their licenses.

31.     The Nursing Board is responsible for enforcing the collaboration requirement contained in Miss. Code § 73-15-20 ("Collaboration Statute"), as well as its own regulations adopted pursuant to that requirement.

32.     The members of the Nursing Board are responsible for determining whether a CNM has violated the Collaboration Statute and Nursing Board Collaboration Rules, and they can impose penalties ranging from a formal reprimand to revocation of the CNM's license where a violation has occurred.

33.    Defendants Sandra Culpepper, Jeremy L. Cummins, Lacey T. Gentry, Janie Clanton, T.J. Adams, Alveno N. Castilla, Carly Walker, Janel Moody, Beverly E. Oliver, Andrew Calhoun, Lawanda Baskin, and Daniel Matthew Sistrunk are members of the Nursing Board. They are sued in their official capacities.

34.    By statute, one of the Nursing Board members must be a physician who also serves on the MSBML. Dr. Renia Dotson is the MSBML member currently serving on the Nursing Board, and she is sued also in her official capacity as a member of the Nursing Board.

35.    Defendant Phyllis Polk Johnson is the Executive Director of the Mississippi Board of Nursing. She is responsible for the day-to-day operations of the Nursing Board. The Nursing Board acts through her. She is sued in her official capacity.

## C. American College of Nurse-Midwives.

36.    Plaintiff American College of Nurse-Midwives ("ACNM") is a 501(c)(6) nonprofit professional membership association.

37.    ACNM's mission is to support midwives; advance the practice of midwifery; and achieve optimal, equitable health outcomes for the people and communities that midwives serve.

38.    ACNM has affiliates in each U.S. state as well as Puerto Rico, the U.S. Virgin Islands, the Uniformed Health Services and the Indian Health Services/Tribal Affiliate.

39.    ACNM has active members in Mississippi.

40.    ACNM advocates on behalf of its members to remove barriers that prevent midwives from serving their communities and ensuring that women, birthing people, and babies are served by a maternal health system that delivers safe, effective, timely, efficient, and patient and family-centered care.

41.    As explained later in this complaint, the ACNM's members who live in Mississippi or are authorized to practice there are injured by the collaboration requirements contained in the challenged statutes and regulations. Because those members would have standing to file this complaint individually, the ACNM has standing to file it on behalf of all of its members who are injured.

## STATUTORY FRAMEWORK

42.    Mississippi regulates CNMs as a type of Advanced Practice Registered Nurse ("APRN") (Miss. Code § 73-15-5(11)).

43.    Mississippi's regulation of CNMs operates through three interlocking sources of law.

    a.    First, Mississippi law requires CNMs and other APRNs to practice pursuant to a collaborative relationship with a physician (the "Collaboration Statute"), codified at Miss. Code §§ 73-15-5(4) and 73-15-20.

    b.    Second, the Nursing Board has adopted regulations implementing and enforcing the Collaboration Statute (the "Nursing Board Collaboration Rules"), codified at Miss. Admin. Code r. 30-2840-1:1.2(A)(8), 1.2(B)(4) and (7), 1.2(C)(5), 1.2(D), and 1.4(C).

    c.    Third, although CNMs are not regulated by the MSBML, it has adopted separate regulations governing the conditions under which physicians may collaborate with CNMs and other APRNs (the "Physician Collaboration Rules"), codified at Miss. Admin. Code r. 30-2630-1, which substantially affect CNMs' ability to comply with the Collaboration Statute and Nursing Board Collaboration Rules and are addressed in detail below.

44.    Under the Collaboration Statute, CNMs must practice "within a collaborative/consultative relationship" with a physician and pursuant to "an established protocol or practice guidelines" agreed to by the physician. The collaborating physician must have a "practice [that] is compatible with that of the nurse practitioner" (Miss. Code § 73-15-20(3), (7)(b), 7(e); § 73-15-5(4)).[1]

45.    The Collaboration Statute requires that the "established protocol or practice guidelines" be submitted to and approved by the Nursing Board (Miss. Code § 73-15-20(3), (7)(c)).

46.    The Collaboration Statute requires that "each collaborative/consultative relationship include and implement a formal quality assurance/quality improvement program," which must "be maintained on site" with the CNM and "be available for inspection by representatives of the" Nursing Board (Miss. Code § 73-15-20(7)(f)).

47.    CNMs must immediately notify the Nursing Board of any change to their collaboration status or established protocol, and all changes must be approved by the Nursing Board (Miss. Code § 73-15-20(6)).

48.    Without physician collaboration, a CNM may not begin practicing, continue practicing, or renew their license (Miss. Code § 73-15-20(3), 7(e)).

49.    If a collaborating physician exits the relationship, or other changes leave the CNM "without a board-approved collaborative/consultative relationship with a licensed physician," the statute provides that the CNM "may not practice" until a replacement established protocol has Nursing Board approval (Miss. Code § 73-15-20(6)).

---

[1] Section 73-15-20, and the challenged regulations, apply to all Advanced Practice Registered Nurses, of which CNMs are a subset. However, this lawsuit seeks relief only as to the application of the statute and the regulations to CNMs.

50.     Physicians are under no obligation to collaborate with CNMs. Physicians may refuse to collaborate or cease collaborating with a CNM for any reason or no reason at all.

51.     The Collaboration Statute does not impose any obligations on the collaborating physician or specify any collaboration required beyond agreeing to the Established Protocol.

52.     The Collaboration Statute falls under the authority of the Nursing Board to interpret and enforce. The Nursing Board Collaboration Rules memorialize the requirements of the Collaboration Statute. The Nursing Board has not imposed on CNMs any materially greater burdens or restrictions regarding physician collaboration than appear in the Collaboration Statute.

53.     The Nursing Board does not dictate the specific contents of CNMs' established protocols or QA/QI Programs.

54.     The Nursing Board's rules provide a mechanism for "emergency" collaboration in the event a CNM loses his or her collaborating physician, but it is limited to two 90-day periods, each of which requires the discretionary approval of the Nursing Board and the MSBML (Miss. Admin. Code r. 30-2840-1:1.2(D)).

55.     CNMs who practice in Mississippi without conforming to the Collaboration Statute and the Nursing Board Collaboration Rules risk revocation of their nursing license.

## FACTUAL ALLEGATIONS

### A.  Mississippi's Broken Maternal Healthcare System

56.     Mississippi ranks at or near the bottom of all states by nearly every measure of health care related to maternity health.

57.     Mississippi's infant mortality rate is nearly double the U.S. average. Infant mortality is the death of a baby within his or her first year of life. Mississippi has the highest

infant mortality rate in the United States. Nearly one in one hundred babies born in Mississippi will die before reaching his or her first birthday. And from bad to worse, last August the State Department of Health reported that the poor infant mortality rates in Mississippi had reached their worst level in a decade.

58.    Mississippi has the highest maternal mortality rate in the United States. Maternal mortality is the death of a mother during pregnancy or the first 42 days after giving birth due to complications from pregnancy or childbirth. Mississippi's maternal mortality rate is nearly double the U.S. average. The Mississippi Maternal Mortality Review Committee (MMRC), established in 2017 following passage of House Bill 494, is tasked with reviewing maternal deaths to identify opportunities for prevention. In 2023, the MMRC determined that 83 percent of the pregnancy-related deaths that occurred in Mississippi between 2017-2021 were preventable. That is, of 77 women who died in Mississippi during this period, 64 of those deaths were preventable.

59.    Mississippi has the highest rate of premature births in the United States. Premature or preterm birth is when a baby is born before 37 weeks of pregnancy. Infants who are born before 37 weeks of pregnancy have an increased risk of breathing complications, infections, brain injury, and death.

60.    Mississippi has the highest rate of low-birthweight babies in the United States. A baby is classified as low birthweight if he or she weighs less than 5.5 pounds (2,500 grams) at birth. Low birthweight is associated with low oxygen levels at birth, infections, jaundice, breathing issues including respiratory distress syndrome, nervous system issues including intraventricular hemorrhage, and digestive issues including serious intestinal inflammation.

61.    Lack of access to care contributes to these tragic statistics: distance to the nearest maternity care provider has a direct effect on health outcomes. Longer distances to a delivery hospital are associated with greater risk of adverse maternal outcomes and admissions to neonatal intensive care units (NICUs).

62.    More than half of Mississippi counties do not have *any* obstetric providers (i.e., obstetrician or certified nurse-midwife). In 2024, the Human Resources & Services Administration of the U.S. Department of Health & Human Services classified every county in Mississippi but one as either a "health professional shortage area" or a "partial health professional shortage area."

63.    Mississippi mothers often travel over an hour to see their obstetrician gynecologist ("OB/GYN"). And, in a state where there is little public transportation outside urban areas, and where per capita vehicle ownership is the second-lowest in the nation, that means pre- and postnatal care is difficult to obtain for many residents.

64.    Mothers who are able to access care face a high likelihood of giving birth via cesarean section (or "c-section"). In Mississippi, more than 37 percent of babies are delivered via c-section—the highest rate in the United States. All but a small percentage of these c-sections are low risk – that is, they are performed on first time mothers who are at least 37 weeks pregnant and delivering a single baby in the head-down position.

65.    A c-section is the surgical delivery of a baby through a cut made in the mother's abdomen and uterus. As compared to vaginal birth, c-sections come with an increased risk of breathing problems and surgical injury for the baby. For mothers, c-sections carry an increased risk of infection, blood loss, blood clots, surgical injury, chronic pelvic pain, and complications

for future pregnancies, including an increased likelihood of future pregnancies being delivered via c-section.

66.     While c-sections carry heightened risks as compared to vaginal births, they are more profitable for physicians and hospitals: average reimbursement for a c-section is 50 percent higher than for vaginal births. And c-sections are performed quickly—the procedure typically takes between 30 and 60 minutes, as compared to hours or even days for a vaginal birth—making them yet more profitable because of the number that can be performed in a short time span.

**B.  CNMs Expand Access to Safe, Affordable Care**

67.     At the beginning of the twentieth century, half of all babies born in the United States were delivered by midwives. In Mississippi, there were 4,209 practicing midwives in 1921. As late as 1947, there were 2,192 midwives in Mississippi who delivered 36 percent of babies. Over the second half of the twentieth century, the practice of midwifery in the United States began to decline as hospital facilities expanded, the number of physicians increased, and provision of maternal health care shifted to the medical setting.

68.     The midwifery model of care is based on the belief that pregnancy and birth are normal life processes. It focuses on monitoring the physical, psychological, and social well-being of the mother throughout the childbearing cycle; providing the mother with individualized education, counseling, and prenatal care, continuous hands-on assistance during labor and delivery, and postpartum support. The midwifery model of care minimizes technological interventions and, when necessary, identifies and refers to a physician those women who require it.

69.    Today, some midwives in Mississippi operate without education, training, or licensing requirements. These Lay Midwives are allowed to practice in Mississippi without any physician collaboration or state oversight.

70.    Some midwives are not nurses but have obtained a certification from a private professional organization and are known as Certified Professional Midwives. While these midwives typically participate in educational training and a hands-on apprenticeship, they are not required to complete a nursing degree or receive post-graduate education. Certified Professional Midwives are allowed to practice in Mississippi without any physician collaboration or state oversight.

71.    CNMs, in contrast, are highly educated and trained medical professionals subject to extensive licensing requirements and state oversight. CNMs must graduate from a competency-based, U.S. Department of Education-approved accredited program resulting in a masters or doctoral level graduate degree that includes hundreds of hours of supervised clinical practice, and must pass a nationally standardized certification examination before practicing.

72.    CNMs practice according to the midwifery model of care, which is more desirable to many families than the highly-medicalized care offered by physicians.

73.    CNMs are trained to avoid unnecessary medical interventions, such as elective c-sections.

74.    CNMs are trained and certified to provide care for normal, low-risk pregnancies and deliveries. CNMs are further trained to refer patients who do not meet those criteria to a physician. CNMs typically deliver babies in a hospital or birthing center, using a midwifery care model.

75.     To practice as a CNM in Mississippi, an individual must first be licensed as a registered nurse ("RN") under Mississippi law and subject to the regulatory authority of the Nursing Board.

76.     A CNM must complete a graduate-level nursing education program—typically a master's or doctoral program—designed to prepare nurses for advanced practice in nurse-midwifery. Such programs must be accredited by a nationally recognized accrediting body and include extensive didactic and supervised clinical training in midwifery and related areas of women's and newborn health.

77.     In addition to graduate education, a CNM must obtain and maintain national certification in nurse-midwifery from a nationally recognized certifying organization. National certification is a prerequisite to state licensure and must remain current as a condition of continued practice in Mississippi.

78.     Mississippi law further requires newly qualified APRNs, including CNMs, to complete a period of post-coursework supervised clinical practice before receiving full authorization to practice independently. Under Mississippi Board of Nursing Rule 1.3, APRNs, including CNMs, must complete at least 1,000 hours of monitored clinical practice—or 2,000 hours in certain circumstances—performed in their role, with a qualifying provider physically present at the practice site. Only licensed physicians or experienced advanced practice registered nurses with compatible education and clinical experience may serve as qualifying providers for purposes of this monitored practice requirement.

79.     Upon satisfying these educational, certification, and supervised practice requirements, a CNM must apply for and obtain state certification from the Mississippi Board of Nursing. CNMs are independently licensed by the Board, are subject to discipline for violations

of professional standards, and must comply with ongoing regulatory obligations, including continuing education, quality assurance and improvement requirements, and prescribing regulations.

80.    Extensive empirical literature demonstrates that midwife-led care for low-risk pregnancies produces outcomes comparable to—or better than—physician-led care, while improving access in underserved areas.

81.    A 2023 peer-reviewed study published in the Journal of Health Economics found that where states had less restrictions on CNMs there was no noticeable impact on obstetric outcomes for births attended by CNMs.

82.    In 2018, a multi-disciplinary task force published a peer-reviewed study based on a five-year investigation across all 50 states and the District of Columbia. The study concluded that states that have done the most to integrate midwives into their health care systems have some of the best outcomes for mothers and babies, whereas the states with the most restrictive midwife laws and practices—including Mississippi—do significantly worse on key indicators of maternal and neonatal well-being.

83.    A landmark report based on a two-year initiative by the Institute of Medicine and Robert Wood Johnson Foundation found that the claim that APRNs (including CNMs) "are less able than physicians to deliver care that is safe, effective, and efficient **is not supported by the decades of research that has examined this question**" and **"[n]o studies suggest that care is better in states that have more restrictive scope-of-practice regulations for APRNs than in those that do not."**[2] The report provided four main policy recommendations, the first of which

---

[2] https://www.nationalacademies.org/read/12956/chapter/8#98

was that **"[n]urses should practice to the full extent of their education and training.**"
(Emphasis added.)

84.     A 2014 report by the Federal Trade Commission that examined collaboration
requirements for APRNs (including CNMs) concluded that such requirements are associated
with several negative outcomes including impeding competition among healthcare providers,
decreased access to healthcare services, higher healthcare costs, reduced quality of care, and less
innovation in health care delivery. The report noted that "[e]mpirical research and on-the-ground
experience demonstrate that APRNs provide safe and effective care within the scope of their
training, certification, and licensure" and that "effective and beneficial collaboration among
health care providers can, and typically does, occur even without mandatory physician
supervision of APRNs."

85.     The FTC report noted that:

> FTC staff have looked to the findings of the [Institute of Medicine]
> and other expert bodies – analyses based on decades of research and
> experience – on issues of APRN safety, effectiveness, and
> efficiency. We have also conducted our own reviews of pertinent
> literature and considered stakeholder input. Based on our research,
> the kinds of supervision requirements examined in FTC staff's
> APRN advocacies **do not appear to be justified by legitimate
> health and safety concerns**. Specifically, our research did not
> identify significant evidentiary support for either the claim that
> independent APRN practice gives rise to significant safety concerns,
> or the claim that mandatory supervision requirements redress such
> concerns.

(emphasis added)

86.     In 2016, the U.S. Department of Veterans Affairs (the "VA"), the nation's largest
healthcare system, granted CNMs (and two other categories of APRNs) full practice authority
without any collaboration or supervision requirements. The VA considered more than 220,000
public comments during a 60-day comment period before concluding that permitting CNMs and

other APRNs to practice to "the full extent of their education, training, and certification, without the clinical supervision of physicians" would permit the VA to "use its health care resources more effectively and in a manner that is consistent with the role of APRNs in the non-VA health care sector, while maintaining the patient-centered, safe, high-quality health care."

87.    A 2021 peer-reviewed report on births within the Military Health System found that low-risk women whose births were attended by CNMs had lower odds of a c-section birth, induction/augmentation of labor, complications of birth, postpartum hemorrhage, endometritis, and preterm birth and higher odds of a vaginal birth, VBAC, and breastfeeding than women whose births were attended by physicians.

88.    A 2018 peer-reviewed study found a decreased risk of labor interventions and operative birth for comparable deliveries assisted by CNMs as compared with physicians.

89.    A peer-reviewed study surveying uncomplicated across the United States found that infant mortality was 19% lower for CNMs than for physician-attended births, the risk of neonatal mortality was 33% lower, and the risk of delivering a low birthweight infant was 31% lower.

90.    CNMs are critical to filling the need for high-quality maternity care in rural areas. Empirical research has shown that states that allow CNMs to practice independently have a higher proportion of midwives serving rural communities.

## C. The Collaboration Statute Blocks CNMs from Practicing and Unnecessarily Burdens Those Who Can

91.    CNMs suffer a range of burdens from the Collaboration Statute that ultimately reduce the number of CNMs practicing in Mississippi and thereby deprive Mississippi mothers and babies of access to safe, affordable care.

92.    ACNM's membership consists of several categories of CNMs who are burdened by the Collaboration Statute because they are practicing in Mississippi or would be but-for the collaboration burdens: (i) Mississippi-licensed CNMs; (ii) CNMs licensed under the Nurse Licensure Compact with a multistate licensure privilege to practice in Mississippi; and (iii) CNM students preparing to be licensed. One or more of these ACNM members have suffered the following injuries because of the Collaboration Statute.

93.    Finding a collaborating physician imposes a significant burden on CNMs. There is no centralized system or resource available to help connect CNMs with available physicians. Physicians are under no obligation to collaborate with CNMs, so the CNM must market themselves to potential collaborators. The process often involves financial negotiations over the fee the physician will charge and the terms of the collaboration.

94.    Some CNMs are unable to find a collaborating physician at all. They are prevented from practicing in Mississippi, and they incur financial and professional damage as a result.

95.    CNMs who cannot find a collaborating physician sometimes face the unpleasant prospect of having to leave Mississippi, and leave behind family or uproot their families, in order to work in their chosen profession in another state with no collaboration requirement. Some end up leaving to do so. Some stay in Mississippi where they must accept other employment, often as a practicing nurse, that does not pay as well and does not make use of or reward their substantial investment in the education and training to become a CNM.

96.    Some CNMs want to practice in Mississippi but are prevented by the cost and difficulty of obtaining a collaborating physician, which discourages them from moving to or attempting to work in Mississippi as a CNM.

97.     Those CNMs who can obtain collaboration face the ongoing burden of maintaining the collaborative relationship on pain of losing their ability to practice. CNMs can work only at the whim of their collaborating physician, who can withdraw permission for any reason or no reason at all. Any disability or disruption to the physician's ability to practice will also disable the CNM relying on them for collaboration. Regardless of why collaboration is lost, the CNM must cease practicing in Mississippi unless and until a new collaborator can be found.[3]

98.     Because of their vulnerability and dependence on a collaborator, CNMs are limited in their ability to bargain with the collaborator for a better contract and better conditions of the working relationship.

99.     Some CNMs must pay expensive fees to a physician because of the Collaboration Statute. CNMs have no bargaining leverage because collaboration is mandatory for them but entirely optional for the physician. CNMs can be forced to pay fees to the collaborating physician that jeopardize their ability to operate a commercially feasible practice, and some physicians demand fees for collaboration that are impossible for the CNM to afford.

100.     Some CNMs are unable to find a collaborating physician unless they agree to work for the physician. Some CNMs must travel long distances to work in the physician's practice as a condition of being able to obtain any collaboration at all.

101.     There are few Mississippi physicians who are eligible to be collaborators with CNMs for the full scope of their practice, including maternal, prenatal, labor and delivery, and postnatal care; and even fewer physicians are willing to do so. Over 60 percent of Mississippi's

---

[3] The rules of the Nursing Board and MSBML authorize two successive 90 day grace periods during which the CNMs can continue practicing if they obtain the approval of both boards for each period. If they cannot find another approved collaborator prior to the expiration of the grace periods, the CNMs must discontinue their practice.

counties do not have a single OB/GYN, and most OB/GYNs are in urban areas. This limits the geographic availability of opportunities for CNMs if the physician insists that the CNM practice in or near the physician's office, and some CNMs must work far from their homes in order to obtain a collaborator.

102.    Some CNMs wish to practice in medically underserved areas of the state where few health care professionals work. But because of the Collaboration Statute and shortage of potential collaborators in those areas, they are unable to do so.

103.    Some CNMs desire to open their own practice or work in a CNM-owned and operated practice, but they are unable to do so because they cannot find a collaborating physician who will support an independent CNM practice as required by the Collaboration Statute.

104.    Some CNMs desire to work in a birthing center, but Mississippi has no birthing centers because of the shortage of CNMs in the state who could staff them.

105.    ACNM's membership also includes an entity in Mississippi that plans to open a birthing center there to provide labor and delivery services under the care of CNMs to women with low-risk pregnancies. It has taken significant steps toward that goal. In prior years, when the entity member was seeking to provide midwife services, it had extreme difficulty recruiting collaborators for CNMs it wished to hire and finding CNMs with existing collaborators who could work for the entity without significant burdens.

106.    Because of the Collaboration Statute, the entity member will not be able to open its birthing center without (1) obtaining a collaborating physician to sponsor the CNM applicants who do not have collaborators, or (2) employing a CNM with an existing collaborator. Even if the entity member is able to do one of these things, its ability to provide consistent service will be completely dependent on the availability and goodwill of the collaborating physician.

Likewise, the entity member's patients' ability to access care will depend entirely on the entity member's relationship with a collaborating physician.

### D. The Collaboration Statute Serves No Legitimate Government Purpose

107.    Most U.S. states permit CNMs to practice without a physician collaboration requirement.

108.    Indeed, Mississippi-licensed CNMs who have obtained a Nurse Licensure Compact may practice in most U.S. states without a collaboration requirement—but they may not do so in Mississippi.

109.    The Veterans Administration, the nation's largest employer of nurses, granted full practice authority to all APRNs in 2016 so that they can practice without physician collaboration or supervision. Accordingly, in VA facilities in Mississippi and throughout the country, no collaboration agreement is required.

110.    Expanding access to CNMs in Mississippi is a proven, commonsense way to lower health care costs while improving outcomes for families. CNMs deliver safe, high-quality Maternity Care with fewer unnecessary interventions and lower c-section rates than physician-led care. By contrast, physician-provided Maternity Care more often relies on higher-cost services and is reimbursed at higher rates by some payers (including Medicaid) even for the same care. Removing barriers that prevent CNMs from practicing to the full extent of their training would reduce costs for the state, strengthen the Maternity Care workforce, and expand access to care where it is needed most.

111.    The State of Mississippi clearly recognizes that CNMs can practice their profession, provide prenatal care, labor and delivery services, and post-natal care, without the supervision of a physician. The Collaboration Statute does not require any supervision. It

requires simply a "collaborative/consultative relationship" with a physician who has "a compatible practice," "an established protocol or practice guidelines," and "a formal quality assurance/quality improvement program." The State is quite correct not to require supervision. But the collaboration requirement means that physicians can effectively limit CNMs from practicing and can require significant fees in order to permit any individual CNM to practice.

112.    The Collaboration Statute affects only those CNMs who might compete directly with physicians to deliver babies in medical settings, rather than other types of midwives with less education and training.

113.    Lay Midwives are exempted from the Collaboration Statute. Lay Midwives typically deliver babies in the mother's home, which physicians and CNMs do not do. Lay Midwives can offer their services in Mississippi even if they have little or no training. Lay Midwives can offer their services in Mississippi without any involvement of a licensing body or licensed professional.

114.    Certified Professional Midwives are exempted from the Collaboration Statute. Although nationally certified, Certified Professional Midwives are not nurses and lack the medical education and training of CNMs. Certified Professional Midwives can offer their services in Mississippi without any involvement of a licensing body or licensed professional.

115.    As a result of the Collaboration Statute, any person in Mississippi who is not a nurse may open a business and offer services assisting with the delivery of babies (and seek payment for their work)—regardless of experience, training, competence, or fitness. A CNM, however, may not do so without risk of having his or her license revoked.

116.    Mississippi law prohibits CNMs from practicing without an active license or if their license has been revoked. A CNM who violates this law faces criminal penalties, including

jail time of more than a year. Thus, while an untrained lay person is free to deliver babies in Mississippi without penalty, a CNM may not engage in the same conduct without risking imprisonment—even if the CNM surrenders his or her CNM license.

117.    The Collaboration Statute requires CNMs to obtain permission from their *direct economic competitors* to practice their profession. Physicians are economically incentivized against providing such support to CNMs.

118.    For decades, national physician organizations like the American Medical Association ("AMA") have opposed legislation that would allow CNMs (among other APRNs) to practice independently. These physician organizations promote a policy preference for "physician-led care" under which non-physician clinicians may provide services only subject to physician supervision or collaboration, even for care that falls squarely within the non-physician's licensed scope, education, and training. The AMA position is advanced uniformly across states and is reflected in model policies and legislative advocacy materials disseminated to state medical associations. In Mississippi, the Mississippi State Medical Association ("MSMA") coordinates with the AMA.

119.    Mississippi's Collaboration Statute mirrors this national policy position of physicians rather than any evidence-based assessment of maternal or infant safety. Mississippi's regulatory framework has remained unchanged since its adoption despite worsening provider shortages and increasingly poor maternity health outcomes. The persistence of the collaboration requirement, untethered from patient safety or quality of care, illustrates that the rule operates as a barrier to practice and access rather than a rational health-and-safety measure.

### E. The MSBML's Requirements for Physicians that Collaborate with CNMs

120.    Although the MSBML has no authority to regulate CNMs compliance with the Collaboration Statute, the rules it has adopted to regulate how physicians may collaborate with APRNs, including CNMs ("Physician Collaboration Rules"), irrationally limit the availability of critically needed maternity care throughout the state as described above and have serious anticompetitive effects as described below.

121.    Because the Collaboration Statute does not itself impose any burdens on physicians, the MSBML's Physician Collaboration Rules are an entirely additive layer of complications. Physicians who would be willing to collaborate with a CNM pursuant to the statutory requirements are instead subjected to additional, burdensome regulations—at the risk of losing their license to practice medicine—that make collaboration less appealing to physicians and thus more expensive for CNMs to obtain. The Physician Collaboration Rules serve to raise the barrier to entry by CNMs. The primary effect of the MSBML's Physician Collaboration Rules is to prevent CNMs from setting up practices that could compete with physicians' practices.

122.    The Physician Collaboration Rules convert the statutory "consultative relationship" into a formal contract. The MSBML prohibits Mississippi physicians from collaborating with APRNs unless they do so "pursuant to a duly executed protocol" that "is a contractual document which sets forth the expectations, practice permissions and boundaries of the relationship between the physician and the APRN." (Rule 1.2(E) and (H)).

123.    Nothing in the Collaboration Statute requires a contract between the APRN and the collaborating physician.

124.    Rule 1.7 provides "Physicians who collaborate with APRNs, who choose to charge or bill the APRNs for the physician's time related to collaboration, should negotiate at

rates considering fair market value." A footnote to that sentence states: "For the purposes of this regulation, 'Reasonable Rates' are as obtained from data maintained by the Medical Group Management Association (MGMA) or a similar resource."

125.    Thus, the Physician Collaboration Rules require that physicians who charge for their collaborative services use a common reference for their pricing.

126.    Failure to adhere to the MSBML's scheme for collaboration contracts is enforced on pain of punishment for "unprofessional conduct," which can result in the "the nonissuance, suspension, revocation or restriction of a license or the denial of reinstatement or renewal of a license."

127.    In addition to converting collaboration into a paid contractual service at standard rates, the Physician Collaboration Rules impose numerous administrative burdens on the collaboration between physicians and CNMs:

    a.  *In-State Practice Requirement.* The MSBML limits the physicians who can provide collaboration by creating an "in-state practice" requirement.

        i.  The MSBML prohibits any Mississippi physician from collaborating with a CNM unless that physician "practices within the state of Mississippi for a minimum of twenty (20) hours per week or eighty (80) hours per month (does not include telemedicine or chart review)."

        ii.  The Collaboration Statute imposes no such requirements.

        iii.  The Collaboration Statute requires only that the physician have an "unrestricted license" and "compatible" practice.

b. *Mileage Requirement.* The MSBML limits the physicians who can provide collaboration by creating a geographic-proximity requirement, which functions as territorial market allocation.

    i. The MSBML requires physicians to submit their collaboration contracts for its approval before they can be finalized if the physician's primary practice site is farther than 75 miles from the CNM's primary practice site. (Rules 1.4 and 1.5)

    ii. This does not apply to physicians working at "all licensed hospitals, state health department facilities, federally qualified community health clinics, and volunteer clinics," regardless of where the CNM works. (Rule 1.2(C))

    iii. The MSBML can reject "Extended Mileage Collaboration" contracts for any reason or no reason at all.

    iv. The Collaboration Statute imposes no such requirements.

    v. The Collaboration Statute allows CNMs and physicians to collaborate without any geographic limitations.

c. *Backup Collaboration.* The MSBML increases the cost and complexity of collaboration contracts by requiring "backup physician coverage when the primary collaborative physician is unavailable, which includes being outside the approved distance for Extended Mileage [Collaboration]." (Rule 1.6)

    i. The backup physician must be a signatory to the collaboration contract. In practice, this means that in order to practice, an APRN

must obtain a contractual relationship with two physicians in his or her specialty.

    ii.  The Collaboration Statute imposes no such requirements.

    iii.  The Collaboration Statute requires only "reliable communication" between the CNM and a single collaborating physician while practicing.

d.  *Filing Requirement.* The MSBML further increases the costs and burdens of collaboration by requiring submission of all required information regarding the collaboration to the MSBML using its online system.

    i.  The MSBML forbids physicians from allowing "the commencement of patient care under the" collaboration contract before it has been filed with the MSBML.

    ii.  The Collaboration Statute imposes no such requirement.

    iii.  The Collaboration Statute requires only that the Nursing Board approve CNMs' protocols.

e.  *Chart Review.* The MSBML also increases the costs and complexity of collaboration by requiring that collaborating physicians include specific terms in their collaboration contracts.

    i.  The MSBML requires that the collaborating physician (A) review "a random sample of charts, as chosen by the collaborative physician or EMR algorithm, that represent 10% or 20 charts, *whichever is less*, of patients seen by the APRN every month" (emphasis added) and (B) "ensure maintenance of a log of charts reviewed which include the

identifier for the patients' charts, reviewers' names, dates of review, conditions treated, and any comments made by the physician regarding care provided."

ii. The Collaboration Statute imposes no such requirements for physicians to conduct chart review.

f. *Face-to-Face Meetings.* The MSBML also increases the costs and complexity of collaboration by requiring that collaborating physicians "meet face to face, either in person or via video conferencing, with each collaborative APRN once per quarter for the purpose of quality assurance, and this meeting shall be documented in the same manner as chart review."

i. The Collaboration Statute imposes no such requirement.

ii. The Collaboration Statute requires only reliable communication while the CNM is practicing.

g. *Record Keeping.* The MSBML also increases the costs and complexity of collaboration by requiring that the "formal quality improvement (QI) program . . . shall be maintained on site and shall be available for inspection by representatives of the Mississippi State Board of Medical Licensure."

i. The Collaboration Statute imposes no such requirement.

ii. The Collaboration Statute requires recordkeeping only by the CNM— that the QA/QI Program is maintained by the CNM for review by the Nursing Board.

128.   The Collaboration Statute already requires that CNMs have reliable communication with their collaborating physician while practicing, and the MSBML's rules do

nothing to increase the availability of the physician to consult in a timely manner with a CNM should unexpected medical complications arise in what had otherwise been an uncomplicated pregnancy.

## F. Relevant Market Definition

### 1. Relevant Markets – Collaboration Services

129.    One relevant market restrained by the Physician Collaboration Rules is the market for CNM-Physician Collaboration Services in which Mississippi-licensed physicians are the exclusive source of supply.

130.    CNM-Physician Collaboration Services refers to a form of collaboration provided by a physician to a CNM that satisfies the requirements of the Collaboration Statute and the Nursing Board Collaboration Rules.

131.    CNM-Physician Collaboration Services are a relevant product or service market because there is no substitute available to CNMs seeking to practice in Mississippi. CNM-Physician Collaboration Services are an essential input to CNMs' treatment of patients without which CNMs cannot—based on the Collaboration Statute—practice as CNMs in Mississippi. If CNM-Physician Collaboration Services are prohibitively expensive or otherwise unavailable to a CNM, then he or she simply cannot practice as a CNM in Mississippi.

132.    CNM-Physician Collaboration Services are obtained either through employment-based arrangements, such as hospital or physician-owned practices, or through independent collaboration agreements that permit CNMs to practice outside a physician's employment.

133.    Mississippi is a relevant geographic market for CNM-Physician Collaboration Services because the Collaboration Statute and Physician Collaboration Rules apply uniformly throughout the state.

## 2. Relevant Markets – Maternity Care

134.    Another relevant market restrained by the Physician Collaboration Rules is the market for Low-Risk Clinical Maternity Care, in which physicians and CNMs compete to provide care to the same mothers with low-risk pregnancy seeking delivery in a hospital or licensed birthing-center setting.

135.    Low-Risk Clinical Maternity Care consists of an integrated course of prenatal care, labor and delivery services, and postpartum follow-up provided to pregnant patients and their newborns. Both physicians and CNMs are trained, licensed, and authorized to provide Low-Risk Clinical Maternity Care, including attending labor and delivery. Patients seek a continuous and coordinated course of pregnancy-related care, and there are no reasonable substitutes for that integrated set of services. General medical care, episodic treatment by unrelated providers, or post-hoc emergency services do not substitute for Low-Risk Clinical Maternity Care.

136.    For low-risk pregnancies, labor and delivery can occur in both hospital and birth-center settings. Patients with low-risk pregnancy commonly consider physicians and CNMs as alternative providers of Low-Risk Clinical Maternity Care when selecting both a care model and a delivery setting.

137.    Accordingly, physicians and CNMs compete directly in the provision of Low-Risk Clinical Maternity Care, and the Physician Collaboration Rules restrain competition within this relevant market.

138.    Mississippi is not a state-wide relevant geographic market for Low-Risk Clinical Maternity Care because the patient needs to live in reasonable proximity to his or her provider to be treated in person, including for delivery of the baby. The relevant geographic markets for Maternity Care in Mississippi are defined by the area reasonably accessible to a hospital or birthing center where labor and delivery can occur.

### G. The Anticompetitive Effects of the MSBML's Physician Collaboration Rules

139.    The FTC concluded in a 2014 report that restrictions like those imposed by the

MSBML harm competition and consumers:

> Physician supervision requirements may raise competition concerns
> because they effectively give one group of health care professionals
> the ability to restrict access to the market by another, competing
> group of health care professionals, thereby denying health care
> consumers the benefits of greater competition. In addition, APRNs
> play a critical role in alleviating provider shortages and expanding
> access to health care services for medically underserved
> populations. . . . Based on substantial evidence and experience,
> expert bodies have concluded that ARPNs are safe and effective as
> independent providers of many health care services within the scope
> of their training, licensure, certification, and current practice.

140.    Both individually and collectively, the MSBML's Physician Collaboration Rules

raise the price for, and/or reduce the output of, CNM-Physician Collaboration Services in

Mississippi.

141.    The Physician Collaboration Rules commercialize the collaboration relationship

by requiring formal contracts and proposing standardized pricing by reference to third-party data,

which encourages charging for CNM-Physician Collaboration Services, discourages price

negotiations, and raises and stabilizes prices.

142.    The Physician Collaboration Rules, individually and collectively, raise the costs

for physicians to provide CNM-Physician Collaboration Services.

143.    The Physician Collaboration Rules, individually and collectively, reduce the

number of physicians willing and able to provide CNM-Physician Collaboration Services.

144.    The MSBML's 75-mile rule operates as a territorial allocation among physicians,

preventing physicians from offering CNM-Physician Collaboration Services without MSBML

approval in parts of the state where they do not maintain a practice site. Consequently, CNMs

can only obtain CNM-Physician Collaboration Services from physicians who work in the same

area, ensuring they will compete with their collaborator for patients and discouraging physicians from agreeing to provide CNM-Physician Collaboration Services. Or other physicians must obtain MSBML approval to allow collaboration—and thus competition—to occur.

145.    The Physician Collaboration Rules have especially costly consequences for CNMs working outside major metropolitan areas where there are fewer (if any) physicians eligible to provide CNM-Physician Collaboration Services.

146.    Additionally, the Physician Collaboration Rules raise the price of, and reduce the output of Low-Risk Clinical Maternity Care in Mississippi by shielding physicians (including OB/GYNs) from competition by CNMs that could provide Low-Risk Clinical Maternity Care to patients with uncomplicated births more efficiently and effectively.

147.    By restricting CNMs' ability to practice, the Physician Collaboration Rules reduce patient access to Low-Risk Clinical Maternity Care and suppress output in that market.

148.    The MSBML Physician Collaboration Rules do not plausibly advance any procompetitive benefits in the market for CNM-Physician Collaboration Services or Low-Risk Clinical Maternity Care. Any purported procompetitive justifications for the Physician Collaboration Rules are pretextual or unsupported.

149.    Less restrictive regulatory alternatives were available to achieve any legitimate regulatory objectives without imposing comparable anticompetitive effects.

## H. The Physician Collaboration Rules Are the Product of a Competitor-Controlled Licensing Board

150.    The MSBML Board Members have agreed to adopt, revise, maintain, supervise, and enforce the Physician Collaboration Rules.

151.    The MSBML Board Members are actively practicing physicians who do or would compete with the APRNs affected by the Physician Collaboration Rules.

152.    The MSBML threatens physicians with punishment for violating any of the Physician Collaboration Rules as "unprofessional conduct" that could cost the physician his or her license to practice medicine, and such draconian punishment will chill the willingness of any physician to risk collaboration in the first instance.

153.    The MSBML has no authority to regulate CNMs. The MSBML cannot justify its regulations on the basis that they provide some quality improvement to CNMs who are regulated exclusively by the Board of Nursing.

154.    The MSBML has no authority to interpret the Collaboration Statute.

155.    The MSBML has no statutory authority to impose greater burdens on physician-APRN collaboration than already imposed by the Collaboration Statute.

## CAUSES OF ACTION

## COUNT ONE

**Violation of the Fourteenth Amendment – Due Process.**

156.    Plaintiff realleges and hereby incorporates by reference the foregoing ¶¶ 1-155 above.

157.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution protects every American's right to pursue legitimate occupations, subject only to regulations that are rationally related to a legitimate government purpose.

158.    Mississippi's Collaboration Statute, the Nursing Board Collaboration Rules, and the Physician Collaboration Rules individually and collectively are onerous and irrational restrictions on the rights of CNMs to pursue their profession and violate Plaintiff's right to due process under the Fourteenth Amendment to the U.S. Constitution.

159.     Unless Defendants with authority to enforce the Collaboration Statute, the Nursing Board Collaboration Rules, and the Physician Collaboration Rules are enjoined from committing the above-described violations of the Fourteenth Amendment, Plaintiff will continue to suffer great and irreparable harm.

## COUNT TWO

### Violation of the Fourteenth Amendment – Equal Protection.

160.     Plaintiff realleges and hereby incorporates by reference the foregoing ¶¶ 1-155 above.

161.     The Equal Protection Clause of the Fourteenth Amendment requires that distinctions among similarly situated persons bear a rational relationship to a legitimate governmental purpose. The state is required to articulate a rational basis for singling out one category of persons for uniquely burdensome restrictions and penalties.

162.     Mississippi's Collaboration Statute and the Nursing Board Collaboration Rules irrationally distinguish between CNMs and other midwives: Other midwives who serve Mississippi mothers and babies, including by attending labor and delivery, are not subject to physician collaboration or comparable enforcement, while CNMs are prohibited from practicing without physician collaboration and face license revocation if they do so.

163.     By requiring CNMs to comply with arbitrary and onerous collaboration requirements that are not required of other midwives, the Collaboration Statute and the Nursing Board Collaboration Rules treat similarly situated occupations differently and therefore violate the rights of Plaintiff to equal protection of the laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

164.     Unless Defendants with authority to enforce the Collaboration Statute and the Nursing Board Collaboration Rules are enjoined from committing the above-described violations of the Fourteenth Amendment, Plaintiff will continue to suffer great and irreparable harm.

## COUNT THREE

**Violation of the Sherman Act, 15 U.S.C. § 1 – Unreasonable Restraint of Trade.**

165.     Plaintiff realleges and hereby incorporates by reference the foregoing ¶¶ 1-155 above.

166.     MSBML Defendants agreed to take the many anticompetitive actions detailed above, including the adoption, maintenance, and enforcement of the Physician Collaboration Rules.

167.     These actions have had in the past, and would in the future have, the anticompetitive effects detailed above, including raising prices for, reducing output of, and restricting access to (i) CNM-Physician Collaboration services in Mississippi and (ii) Low-Risk Clinical Maternity Care, in all relevant geographic markets as defined above in Mississippi.

168.     These actions constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

169.     The Physician Collaboration Rules were not enacted pursuant to a clearly articulated state policy and were not actively supervised by the state, and thus they are not immune from federal antitrust laws.

170.     Unless Defendants with authority to enforce the Physician Collaboration Rules are enjoined from committing the above-described violations of the Sherman Act, Plaintiff will continue to suffer great and irreparable harm.

37

## COUNT FOUR

**Violation of the Sherman Act, 15 U.S.C. § 1 – Per Se Illegal Price Fixing.**

171.    Plaintiff realleges and hereby incorporates by reference the foregoing ¶¶ 1-155 above.

172.    MSBML Defendants agreed to take the many anticompetitive actions detailed above, including the adoption, maintenance, and enforcement of MSBML Rule 1.7 regarding "Billing for Collaborative Oversight."

173.    These actions related to MSBML Rule 1.7 have had in the past, and would in the future have, the anticompetitive effects detailed above, including: raising, fixing, and stabilizing prices for CNM-Physician Collaboration services in Mississippi.

174.    These actions constitute a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

175.    The Physician Collaboration Rules were not enacted pursuant to a clearly articulated state policy and were not actively supervised by the state, and thus they are not immune from federal antitrust laws.

176.    Unless Defendants with authority to enforce MSBML Rule 1.7 are enjoined from committing the above-described violations of the Sherman Act, Plaintiff will continue to suffer great and irreparable harm.

## COUNT FIVE

**Violation of the Sherman Act, 15 U.S.C. § 1 – Per Se Illegal Territorial Allocation.**

177.    Plaintiff realleges and hereby incorporates by reference the foregoing ¶¶ 1-155 above.

178.    MSBML Defendants agreed to take the many anticompetitive actions detailed above, including the adoption, maintenance, and enforcement of MSBML Rules 1.1 and 1.4 regarding "Extended Mileage Collaboration."

179.    These actions related to MSBML Rules 1.1 and 1.4 have had in the past, and would in the future have, the anticompetitive effects detailed above, including allocating between physicians territory to stabilize, reduce, and prevent competition in providing CNM-Physician Collaboration services in Mississippi.

180.    Additionally, these actions related to MSBML Rules 1.1 and 1.4 have had in the past, and would in the future have, the anticompetitive effects detailed above, including allocating between physicians territory to control, impair, or prevent entry by CNMs to offer Low-Risk Clinical Maternity Care, in all relevant geographic markets as alleged above.

181.    These actions constitute a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

182.    The Physician Collaboration Rules were not enacted pursuant to a clearly articulated state policy and were not actively supervised by the state, and thus they are not immune from federal antitrust laws.

183.    Unless Defendants with authority to enforce MSBML Rules 1.1 and 1.4 are enjoined from committing the above-described violations of the Sherman Act, Plaintiff will continue to suffer great and irreparable harm.

## COUNT SIX

**Violation of the Mississippi Antitrust Act, Miss. Code §§ 75-21-1, 75-21-3 – Unlawful Trust/Combine and Restraint of Trade.**

184.    Plaintiff realleges and incorporates by reference the foregoing ¶¶ 1-155 above.

185.     Mississippi law declares unlawful any combination, contract, understanding, or agreement in restraint of trade or competition. Miss. Code §§ 75-21-1, 75-21-3.

186.     MSBML Defendants agreed to take the anticompetitive actions alleged above, including the adoption, maintenance, and enforcement of the Physician Collaboration Rules and related policies and practices.

187.     These actions have had in the past, and would in the future have, the effect of raising and maintaining the price of and restricting access to (i) CNM-Physician Collaboration services in Mississippi and (ii) Low-Risk Clinical Maternity Care, in all relevant geographic markets as defined above in Mississippi.

188.     These actions constitute an unlawful trust/combine and unreasonable restraint of trade in violation of Miss. Code §§ 75-21-1 and 75-21-3.

189.     To the extent a state-action immunity doctrine is recognized under Mississippi law, the challenged conduct was not undertaken pursuant to a clearly articulated and affirmatively expressed state policy and was not actively supervised by the State.

190.     Unless Defendants with authority to enforce the Physician Collaboration Rules are enjoined from committing the above-described violations of the Mississippi Antitrust Act, Plaintiff will continue to suffer great and irreparable harm.

### **COUNT SEVEN**

**Violation of the Mississippi Antitrust Act, Miss. Code §§ 75-21-1, 75-21-3 – Per Se Illegal Price Fixing.**

191.     Plaintiff realleges and incorporates by reference the foregoing ¶¶ 1-155 above.

192.     MSBML Defendants agreed to take the many anticompetitive actions detailed above, including the adoption, maintenance, and enforcement of MSBML Rule 1.7 regarding "Billing for Collaborative Oversight."

40

193.     These actions related to MSBML Rule 1.7 have had in the past, and would in the future have, the anticompetitive effects detailed above, including: raising, fixing, and stabilizing prices for CNM-Physician Collaboration services in Mississippi.

194.     These actions constitute a per se violation of the Mississippi Antitrust Act, Miss. Code §§ 75-21-1 and 75-21-3.

195.     To the extent a state-action immunity doctrine is recognized under Mississippi law, the challenged conduct was not undertaken pursuant to a clearly articulated and affirmatively expressed state policy and was not actively supervised by the State.

196.     Unless Defendants with authority to enforce MSBML Rule 1.7 are enjoined from committing the above-described violations of the Mississippi Antitrust Act, Plaintiff will continue to suffer great and irreparable harm.

## COUNT EIGHT

### Violation of the Mississippi Antitrust Act, Miss. Code §§ 75-21-1, 75-21-3 – Per Se Illegal Territorial Allocation.

197.     Plaintiff realleges and incorporates by reference the foregoing ¶¶ 1-155 above.

198.     MSBML Defendants agreed to take the many anticompetitive actions detailed above, including the adoption, maintenance, and enforcement of MSBML Rules 1.1 and 1.4 regarding "Extended Mileage Collaboration."

199.     These actions related to MSBML Rules 1.1 and 1.4 have had in the past, and would in the future have, the anticompetitive effects detailed above, including allocating physician territory to stabilize, reduce, and prevent competition in providing CNM-Physician Collaboration services in Mississippi.

200.     Additionally, these actions related to MSBML Rules 1.1 and 1.4 have had in the past, and would in the future have, the anticompetitive effects detailed above, including

allocating physician territory to control, impair, or prevent entry by CNMs to offer Low-Risk Clinical Maternity Care, in all geographic markets in Mississippi as alleged above.

201.    These actions constitute a per se violation of the Mississippi Antitrust Act, Miss. Code §§ 75-21-1 and 75-21-3.

202.    To the extent a state-action immunity doctrine is recognized under Mississippi law, the challenged conduct was not undertaken pursuant to a clearly articulated and affirmatively expressed state policy and was not actively supervised by the State.

203.    Unless Defendants with authority to enforce MSBML Rules 1.1 and 1.4 are enjoined from committing the above-described violations of the Mississippi Antitrust Act, Plaintiff will continue to suffer great and irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A. **Declaratory Relief as to the Collaboration Statute**: A declaration that Miss. Code § 73-15-5(4) and §§ 73-15-20(3), (6), (7)(b), (7)(e), and (7)(f), as applied to CNMs, violate the Fourteenth Amendment to the United States Constitution.

B. **Injunctive Relief as to the Collaboration Statute**: A permanent injunction prohibiting Defendants from enforcing Miss. Code § 73-15-5(4) and §§ 73-15-20(3), (6), (7)(b), (7)(e), and (7)(f) against CNMs.

C. **Declaratory Relief as to the Board of Nursing Rules**: A declaration pursuant to 28 U.S.C. § 2201 that Miss. Admin. Code r. 30-2840-1:1.2(A)(8), 1.2(B)(4) and (7), 1.2(C)(5), 1.2(D), and 1.4(C), the Mississippi Board of Nursing's rules regarding

42

physician collaboration, as applied to CNMs, violate the Fourteenth Amendment to the United States Constitution.

D. **Injunctive Relief as to the Board of Nursing Rules**: A permanent injunction prohibiting Defendants from enforcing Miss. Admin. Code r. 30-2840-1:1.2(A)(8), 1.2(B)(4) and (7), 1.2(C)(5), 1.2(D), and 1.4(C) against CNMs.

E. **Declaratory Relief as to the MSBML Rules**: A declaration pursuant to 28 U.S.C. § 2201 that Miss. Admin. Code r. 30-2630-1, the MSBML's rules governing physician collaboration, as applied to physicians collaborating with CNMs, constitute unreasonable restraints of trade and per se unlawful restraints of trade, and unlawful anticompetitive conduct, in violation of:

    a. Federal antitrust law, including Section 1 of the Sherman Act, 15 U.S.C. § 1, including unreasonable restraint of trade, per se illegal price fixing, and per se illegal territorial allocation; and

    b. Mississippi state antitrust and competition laws, including Miss. Code § 75-21-1 et seq., including unlawful trust/combine and unreasonable restraint of trade, per se illegal price fixing, and per se illegal territorial allocation.

F. **Injunctive Relief as to the MSBML's Rules**: A permanent injunction prohibiting Defendants from enforcing Miss. Admin. Code r. 30-2630-1 against physicians collaborating with CNMs.

G. **Costs and Fees**: An award of Plaintiffs' reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision of law.

H. **Further Relief**: Such other and further relief as the Court deems just and proper.

Respectfully submitted this 20th day of January, 2026.

_____ *s/ Robert B. McDuff* _____
MISSISSIPPI CENTER FOR JUSTICE
Robert B. McDuff, MS Bar# 2532
Paloma Wu
210 E. Capitol Street
Suite 1800
Jackson, MS 39201
TEL: (601) 259-8484
FAX: (601) 352-4769
rmcduff@mscenterforjustice.org

PILLSBURY WINTHROP SHAW
PITTMAN LLP
Michael L. Sibarium*
Drew A. Navikas*
1200 Seventeenth Street
Washington, DC 20036
TEL: (202) 663-8000
FAX: (202) 663-8007
michael.sibarium@pillsburylaw.com
drew.navikas@pillsburylaw.com

AMABEBE LAW PLLC
Eremipagamo M. Amabebe*
447 Broadway, Suite 2 #1169
New York, New York 10013
TEL: (212) 444-3960
eamabebe@amabebelaw.com

*Attorneys for Plaintiff American College of Nurse-Midwives*

**Pro hac vice* motion to be filed.